**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **SHAWN L. BURKS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No.  1:07-cv-00337-MEF-TFM** |
| | ) |
| **DAVE SUTTON, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>DEFENDANTS' SPECIAL REPORT</u>

COME NOW Sheriff Dave Sutton, Capt. Richard B. Moss, and Deputy Sheriff Glenn Shelton, the Defendants in the above-styled cause, and submit their Special Report to the Court.

## INTRODUCTION

On April 10, 2007, Plaintiff filed his Complaint with this Court, naming Dave Sutton, the Coffee County Sheriff, Richard B. Moss, the Coffee County Jail Administrator, and Glenn Shelton, a Coffee County Deputy Sheriff.[1]  (Doc. 1.)  On April 24, 2007, the Court ordered Defendants to file a Special Report.  (Doc. 3.)  On May 31, 2007, the Defendants filed a Motion for Extension of Time to File Their Special Report and Answer.  (Doc. 8.)  On June 1, 2007, the Court granted the Defendants' Motion and extended the time for the filing of a Special Report to July 13, 2007. (Doc. 9.)

## PLAINTIFF'S ALLEGATIONS

In his Complaint, the Plaintiff appears to name two federal claims and one state law claim.  First, the Complaint appears to allege a claim for excessive force arising out of a riot in the Coffee County Jail.  Second, the Plaintiff appears to allege a claim for deliberate indifference

---

[1] Dave Sutton is sued as the "Dave Sutton, Sheriff"; Richard B. Moss is sued as "Richard B. Moss, Jail Administrator"; and Glenn Shelton is sued as "Glenn Shelton, Deputy."  (Doc. 1, Caption of Complaint.)  It, therefore, appears that the Plaintiff has sued these Defendants in their individual and official capacities.

to his medical condition and inadequate treatment of the injuries he sustained during the riot. Finally, the Complaint appears to allege a cause of action for assault under Alabama tort law.

The Plaintiff seeks compensatory damages of $1,000,000.00, as well as punitive damages in the amount of $1,000,000.00, and injunctive relief to provide him with the medical care he alleges he has not received.[2]

### DEFENDANTS' RESPONSE TO PLAINTIFF'S ALLEGATIONS

The Defendants deny the allegations made against them by Plaintiff as being untrue and completely without basis in law or fact. The Defendants deny that they acted, or caused anyone to act, in such a manner as to deprive Plaintiff of any right to which he was entitled. The Defendants raise the defenses of Eleventh Amendment immunity, absolute immunity, qualified immunity, and additional defenses presented below. The Defendants reserve the right to add additional defenses if any further pleading is required or allowed by the Court.

### I.    FACTS

The Plaintiff was incarcerated in Cell Block 2 at the Coffee County Jail on March 24, 2006, on two counts of attempting to commit a crime with controlled substance, specifically cocaine, serving a ten-year sentence. (Ex. A, Inmate Records of Shawn Burks, "Inmate Records," Intake Sheet; Ex. B, Inmates Records, Sentencing Order, p. 1.) The Plaintiff was incarcerated in Cell Block 2. Since filing this Complaint against the Defendants, the Plaintiff has been transferred to a Department of Corrections detention facility in Mount Meigs, Alabama. (Doc. 6, Notice of Change of Address by Shawn L. Burks.)

On May 3, 2007, just two days after a tornado struck Enterprise, Alabama, an inmate riot broke out at the Coffee County Jail. (Ex. C, Affidavit of Dave Sutton, "Sutton Aff.," ¶¶ 7-8; Ex.

---

[2] Since filing this Complaint against the Defendants, the Plaintiff has been transferred to a Department of Corrections detention facility in Mount Meigs, Alabama. (Doc. 6, Notice of Change of Address by Shawn L. Burks.) Accordingly, as discussed below, the request for injunctive relief in the Amended Complaint is now moot.

D, Affidavit of Jeffery Shelton, "Shelton Aff.," ¶¶ 4-5.)  The inmates in Cell Block 2 refused to lockdown because they did not get a second smoke break prior to lockdown, and they were fighting each other and the corrections officers in the cell block.  (Sutton Aff., ¶ 8; Ex. E, Affidavit of Neal Bradley, "Bradley Aff.," ¶ 6.)  The staff at the jail sent out radio calls for assistance, and nearby officers, who were participating in search and recovery operations in response to the tornado damage in Enterprise, came to the jail to help control the riot.  (Sutton Aff., ¶ 7; Bradley Aff., ¶¶ 4-5.; Shelton Aff., ¶¶ 4-5.)  When the Officers arrived in Cell Block 2, they told the inmates to lockdown and return to their cells, which some of them did.  (Bradley Aff., ¶ 10.)  The inmates were informed that their insubordination would not be tolerated but that no inmate would be mistreated.  (Ex. F, Affidavit of Richard B. Moss, "Moss Aff.," ¶ 8.)

A.    **Use of Force**

The Plaintiff appears to allege an excessive force claim on the grounds that he was shot in the abdomen with a beanbag round during the efforts to lockdown the inmates following the riot.  (Doc. 1, p. 4.)  The week prior to the riot in Cell Block 2, at least one shank was discovered and removed from Cell Block 2.  (Bradley Aff., ¶ 7; Shelton Aff., ¶ 7; Ex. G, Affidavit of Austin Redman, "Redman Aff.," ¶ 7.)  At that time, there were three to five cell doors that could not be electronically locked from the control room.  (Sutton Aff., ¶ 22; Redman Aff., ¶ 32; Shelton Aff., ¶ 32.)

During the riot, the Plaintiff was screaming at the rioting inmates from his cell, inciting and perpetuating the inmate riot.  (Shelton Aff., ¶ 31; Redman Aff., ¶ 31.)  When Officers Shelton and Redman approached the Plaintiff's cell to subdue him, the door to his cell was shut, but it was unclear whether the door was locked.  (Shelton Aff., ¶ 33; Redman Aff., ¶ 33.)  Officer Shelton ordered the Plaintiff to step back from the door several times, but the Plaintiff refused and yelled obscenities at the officers.  (Shelton Aff., ¶ 35; Redman Aff., ¶ 35.)  Officer Shelton

3

raised his shotgun, loaded with a beanbag round,[3] aimed it at the Plaintiff's abdomen, and again ordered the Plaintiff to back away from the door. (Shelton Aff., ¶ 36; Redman Aff., ¶ 36.) The Plaintiff again refused to step back and continued to be disruptive and uncooperative, berating the officers with vulgar language. (Shelton Aff., ¶¶ 37-38; Redman Aff., ¶¶ 37-38.) In order to gain the Plaintiff's compliance, Officer Shelton fired the beanbag round at the Plaintiff's abdomen from a distance of 20-30 feet. (Shelton Aff., ¶¶ 39-41.) Once the beanbag round struck the Plaintiff, he stepped back from the cell door and sat on his bed, and the officers were able to secure the cell and subdue the Plaintiff. (Shelton Aff., ¶¶ 43, 46-47; Redman Aff., ¶¶ 41, 44.)

In 2004, Officer Shelton attended a tactical shotgun course that devoted an entire day to the use of non-lethal rounds such as beanbags. He was certified as a user and instructor of such rounds. (Shelton Aff., ¶ 9.) When Officer Shelton used the beanbag round on the Plaintiff, he did so in accordance with the training he received. (Shelton Aff., ¶ 42.) After being struck, the Plaintiff complied with the deputies' instructions and no further force was used against him.

## B.    Medical Care

The Plaintiff appears to allege a claim for denial of medical care for any injuries caused by the beanbag round. (Doc. 1, p. 5.) After being struck with the beanbag round, the Plaintiff did not request immediate medical treatment; in fact, the Plaintiff refused immediate medical treatment. (Shelton Aff., ¶ 45; Redman Aff., ¶ 3; Moss Aff., ¶ 13.) Immediately after the riot, the Jail Administrator, Richard Moss, went to speak with the Plaintiff to check on his medical condition. (Moss Aff., ¶¶ 10, 12.) Administrator Moss asked to see the Plaintiff's abdomen, and

---

[3] Beanbag rounds are small bags filled with beads designed to be deployed from a shotgun. See Bell v. Irwin, 321 F.3d 637, 639 (7th Cir. 2003). In Bell, the Seventh Circuit has described the effects of a beanbag round as follows: "Bean-bag rounds are designed to stun and inflict blunt trauma, knocking a person down but not penetrating the skin or damaging internal organs more severely than a kick or punch would." Id.

when the Plaintiff lifted his shirt, Administrator Moss saw an abrasion with discoloration on the Plaintiff's abdomen.  (Moss Aff., ¶ 10.)   Administrator Moss offered the Plaintiff medical treatment, but the Plaintiff refused.  (Moss Aff., ¶ 13.)  Two days later, when he arrived at the jail on Monday morning,[4] Administrator Moss brought the Plaintiff into his office to again inquire about his medical situation.  (Moss Aff., ¶ 21.)  The Plaintiff told Administrator Moss that he was sore and had blood in his urine.  (Moss Aff., ¶ 21.)  Administrator Moss again inspected the Plaintiff's bruise on his abdomen, and informed the Plaintiff that he would be taken to the doctor as a precaution.  (Moss Aff., ¶¶ 22-23.)

Administrator Moss took the Plaintiff to see Dr. Henry Cochran in Elba, Alabama. (Moss Aff., ¶ 25; Ex. H, Declaration of Dr. Henry Cochran, "Cochran Decl.," ¶ 3.)   At the doctor's office, the Plaintiff complained that he had been hit by a beanbag round from a shotgun, and he complained that he had blood in his urine.  (Cochran Decl., ¶ 4.)  Dr. Cochran observed that the Plaintiff had a bruise on his abdomen that was not tender, and he noted that the Plaintiff had no blood in his urine.  (Cochran Decl., ¶¶ 5-6.)  Dr. Cochran concluded that the bruise on the Plaintiff's abdomen was "superficial," and prescribed moist heat to aid in the resolution of the bruise.  (Cochran Decl., ¶¶ 7-8.)  It was Dr. Cochran's opinion that the bruise would resolve within a week.  (Cochran Decl., ¶ 9.)

### C.    The Coffee County Jail Grievance Policy

It is the policy of the Coffee County Jail that an inmate with a grievance may request a grievance form from any corrections officer at any time.  (Moss Aff., ¶ 16.)  The grievance form can then be returned completed to any corrections officer, and the corrections officer must then attempt to respond to the grievance.  (Moss Aff., ¶ 16.)  If the corrections officer is unable to respond to the grievance, it is passed on to Administrator Moss.  (Moss Aff., ¶ 16.)   If

---

[4] The incident occurred on March 3, 2007, a Saturday.

Administrator Moss is unable to handle the grievance, the inmate receives a grievance hearing by the grievance committee, which consists of Administrator Moss, Chief Deputy Ronnie Whitworth, and Deputy Neal Bradley. (Moss Aff., ¶ 17.) Burks did not file a grievance regarding the incidents he alleges in his Complaint. (Moss Aff., ¶ 15.)

## II.    LAW

### A.    The Plaintiff's claims are barred because he has failed to comply with the provisions mandated by 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA").

#### 1.    The Plaintiff has failed to exhaust all available administrative remedies.

The Court's adherence to mandates of the PLRA is essential to ensure that the "flood" of frivolous claims for constitutional violations does not burden and hinder the Court's consideration of legitimate claims presented by pro se litigants. See Harris v. Garner, 216 F.3d 970, 972 (11th Cir. 2000) ("In an effort to stem the flood of prisoner lawsuits in federal court, Congress enacted the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ('PLRA')."). As the Supreme Court recently recognized in Jones v. Bock:

> Prisoner litigation continues to "account for an outsized share of filings" in federal district courts. Woodford v. Ngo, 548 U.S. ----, ----, n. 4, 126 S. Ct. 2378 (2006) (slip op., at 12, n. 4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. [footnote omitted] Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit. See Neitzke v. Williams, 490 U.S. 319, 327 [] (1989).

> Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. See Porter v. Nussle, 534 U.S. 516, 524, [] (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

127 S. Ct. at 914 (emphasis added).  Uniform adherence to all the provisions of the PLRA, especially the grievance exhaustion requirement, is mandatory for inmate litigants and the Courts to ensure that the federal judicial system can effectively "separate the wheat from the chaff" with regard to claims asserted by inmate litigants.

The first section of the PLRA provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (emphasis added).  Under this provision of the PLRA, an inmate is required to exhaust all administrative remedies before instituting an action under 42 U.S.C. § 1983, and the Court is precluded from granting relief to any plaintiff who has not exhausted all his administrative remedies.  In Woodford v. Ngo, ___ U.S. ___; 126 S. Ct. 2378, 2382 (2006), the Supreme Court held, "Exhaustion is no longer left to the discretion of the district court, but is mandatory."  See also Booth v. Churner, 532 U.S. 731, 739 (2001) ("Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards.").  However, as the Supreme Court recognized in Jones v. Bock, each prison sets its own parameters for what constitutes compliance with its grievance policy:

In Woodford, we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," 548 U.S., at ___, 126 S. Ct. 2378 [] -- rules that are defined not by the PLRA, but by the prison grievance process itself. …. The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

127 S. Ct. at 922-23.

Here, the Plaintiff only filed no grievance regulating to the incidents made the basis of his complaint, as is required by the Coffee County Jail grievance policy.  Therefore, he cannot be

deemed to have exhausted all available administrative remedies provided by the Calhoun County

Jail grievance policy, as is required by § 1997e(a) of the PLRA. Therefore, his claims must be

dismissed.

### 2. Plaintiff's claims are barred by the PLRA because he has not suffered any physical injury as a result of the allegations in his Complaint.

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other

correctional facility, for mental or emotional injury suffered while in custody without a prior

showing of physical injury . . . .  In order to avoid dismissal under § 1997e(e), a prisoner's claims

for emotional or mental injury must be accompanied by allegations of physical injuries that are

greater than de minimis." Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309 (11th

Cir. 2002).  Because the Plaintiff has not made a showing of physical injury at all, much less a

showing of a physical injury that is greater than de minimis, his Complaint is due to be

dismissed.

### B. All claims by the Plaintiff against the Defendants in their official capacities must fail based on Eleventh Amendment immunity and because they are not "persons" under 42 U.S.C. § 1983.

Plaintiff's claims against the Defendants in their official capacities are due to be

dismissed for lack of subject matter jurisdiction; as such claims are barred by the Eleventh

Amendment to the United States Constitution. Parker v. Williams, 862 F.2d 1471, 1476 (11th

Cir. 1989) (holding a sheriff sued in his official capacity is entitled to Eleventh Amendment

immunity); Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989) (holding that a sheriff sued in

his official capacity is entitled to Eleventh Amendment immunity); Carr v. City of Florence, 918

F.2d 1521, 1525 (11th Cir. 1990) (holding a deputy sheriff sued in his official capacity is entitled

to Eleventh Amendment immunity); Lancaster v. Monroe County, 116 F.3d 1419, 1430-31 (11th

Cir. 1997) (extending Eleventh Amendment immunity to include jailers employed by county sheriffs).

In addition, the official capacities claims must fail because 42 U.S.C. § 1983 prohibits a person, acting under color of law, from depriving another of his rights secured by the United States Constitution. 42 U.S.C. § 1983 (emphasis added). The United States Supreme Court has held that state officials, in their official capacities, are not "persons" under § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Any official capacity claims against the Defendant(s) should therefore be dismissed because these Defendants are not "persons" under § 1983 and therefore all official capacity claims fail to state a claim upon which relief can be granted. Id.; Carr, 916 F.2d at 1525 n.3.

### C.   Alternatively, these Defendants are entitled to summary judgment based on absolute immunity and qualified immunity.

The Plaintiff's claims are barred on two additional immunity grounds. First, the Defendants are absolutely immune under Article I, § 14 of the Alabama Constitution of 1901 in both their official and individual capacities. Second, in their individual capacities, the Defendants are entitled to qualified immunity to the Plaintiff's federal claims.

### 1.   These Defendants are entitled to absolute immunity to Plaintiff's state law tort claim.

These Defendants are absolutely immune to Plaintiff's claims for money damages under Article I, § 14 of the Alabama Constitution of 1901. Article I, § 14 of the Alabama Constitution of 1901 provides "[t]hat the State of Alabama shall never be made a defendant in any court of law or equity." This section grants the State and its agencies an "absolute" immunity from suit in any court. Ex parte Mobile County Dep't of Human Res., 815 So. 2d 527, 530 (Ala. 2001). Section 14 immunity bars "almost every conceivable type of suit." Hutchinson v. Bd. of

9

Trustees of Univ. of Ala., 256 So. 2d 281, 283 (Ala. 1971).  Section 14 immunity is "nearly impregnable."  Patterson v. Gladwin Corp., 835 So. 2d 137, 142 (Ala. 2002).

Dave Sutton, as Sheriff of Coffee County, is an executive branch constitutional officer of the State of Alabama.  See Article V, § 112 of the Alabama Constitution of 1901; see also McMillian v. Monroe County, 520 U.S. 781, 793 (1997) (holding that an Alabama sheriff acts for the state and not his county when carrying out law enforcement duties); Carr v. City of Florence, 916 F.2d 1521, 1525-26 (11th Cir. 1990).  Therefore, a suit against him in his official capacity is a suit against the State of Alabama.  See Hafer v. Melo, 502 U.S. 21, 25 (1991); Lancaster v. Monroe County, 116 F.3d 1419, 1429 (11th Cir. 1998); see also Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  Similarly, because Administrator Moss and Deputy Shelton acted for the Sheriff as Jail Administrator and Deputy Sheriff, respectively, they are also state officials.  Lancaster, 116 F.3d at 1429 ("Alabama jailers are state officials entitled to Eleventh Amendment immunity when sued in their official capacities.").

As executive branch, constitutional officers of the State at the time of the alleged incidents, these Defendants are immune from suit under Article I, § 14 of the Alabama Constitution of 1901.  This section immunizes them from **all** state law claims, including tort claims, even though they are sued in their individual capacities.  Tinney v. Shores, 77 F.3d 378, 383 (11th Cir. 1986) (holding sheriff and deputy sheriff were entitled to state sovereign immunity); Lancaster, 116 F.3d at 1431 (holding sheriff and jailers were entitled to sovereign immunity); Parker v. Amerson, 519 So. 2d 442, 445 (1987) (holding the Sheriff immune from suit although sued "individually, and as Sheriff"); Ex parte Purvis, 689 So. 2d 794, 796 (Ala. 1996) (holding sheriff and deputy were entitled to sovereign immunity in both their individual and official capacities); Ex parte Haralson, 871 So. 2d 802, 807 (Ala. 2003) (holding deputy sheriff entitled to sovereign immunity).

There are, however, limited exceptions to this immunity. An Alabama sheriff is immune from suit:

> except for actions brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute.

Parker, 519 So. 2d at 443. Accordingly, even in situations where sheriffs and their employees are sued for negligence or bad faith, the only exceptions to sovereign immunity allowed by the Alabama Supreme Court under Art. 1, § 14 of the Alabama Constitution of 1901, are to enjoin their conduct. Alexander v. Hatfield, 652 So. 2d 1142, 1143 (Ala. 1994). With only these narrow exceptions, Alabama sheriffs and their deputies are immune from suit. Ex parte Purvis, 689 So. 2d at 796; Ex parte Blankenship, 893 So. 2d 303, 305 (Ala. 2004).

The Alabama Supreme Court again affirmed that sheriffs and deputies enjoy absolute immunity to state law money damages claims. Ex parte Davis, 930 So. 2d 497, 501 (Ala. 2005). In Davis, the Conecuh County Circuit Court refused to grant a Conecuh County deputy's motion to dismiss state law money damages claims. 930 So. 2d at 499. The Plaintiff's claims against the deputy included false imprisonment, assault and battery, outrage, wantonness, negligence, trespass, and conversion. Id. Granting the deputy's petition for a writ of mandamus and instructing the circuit court to grant the motion to dismiss, the Alabama Supreme Court held that "an action against a sheriff – or a deputy sheriff – for damages arising out of the performance of his duties is essentially a suit against the state" and thereby barred under Article I, § 14 of the Alabama Constitution of 1901. Id. at 501 (internal quotations and citations omitted).

Here, the Plaintiff has alleged that at all times relevant he was an inmate in the Coffee County Jail. He has alleged that the actions taken by Sheriff Sutton, Administrator Moss, and Deputy Shelton were taken in their capacities as Sheriff, Jail Administrator, and Deputy Sheriff.

It is only in those capacities these men had any authority or reason to supervise the Plaintiff or control his movements in any way. It was only in their respective capacities that these men had any authority to supervise the corrections officers handling medical claims, the administration of medications, and the transportation of inmates to medical professionals. Accordingly, because the Defendants are being sued for actions taken in the line and scope of their duties and the Plaintiff seeks money damages for his negligence claim, that claim is barred by Article I, § 14 of the Alabama Constitution of 1901.

> **2.**     **These Defendants are entitled to qualified immunity because nothing in their conduct crossed a "bright line" contour of clearly established constitutional law.**

To the extent the Complaint states a claim against the Defendants in their individual capacities,[5] they were acting within their discretionary authority as the Sheriff of Coffee County, the Jail Administrator of the Coffee County Jail, and a Deputy Sheriff of Coffee County during all times relevant to Plaintiff's Complaint because all their actions were taken in the furtherance of their duties. See, e.g. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004). Once a defendant has asserted the defense of qualified immunity and shown that he was acting within his discretionary authority, the threshold inquiry a court must undertake is whether Plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). As set forth previously, the Amended Complaint appears to state two federal claims. The Plaintiff alleges that the

---

[5] The Defendants do not concede that the Complaint states a claim against them in their individual capacities. See note 1, supra. However, to the extent that this Court construes the Complaint as asserting individual capacity claims, the Defendants assert all available defenses to those claims.

Defendants denied him proper medical care, but he has failed to establish that any conduct of the Defendants violated any federally protected right.

>    **a.     Neither Sheriff Sutton, nor Administrator Moss, nor Deputy Shelton violated Plaintiff's federally protected rights.**

>          **i.     Excessive Force Claim**

The standard used in analyzing excessive force claims is as follows:  "[W]hether or not a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm."  Whitley v. Albers, 475 U.S. 312, 320-21 (1984); Bozeman v. Orum, 422 F.3d 125 (11th Cir. 2005).  The factors to be considered in evaluating whether the use of force was wanton and unnecessary include: 1) the need for application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate.  Whitley v. Albers, 475 U.S. at 1085.

"The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."  Whitley v. Albers, 475 U.S. 312, 319 (1986).  "[I]n evaluating the challenged conduct of jail officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment."  Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987).  Courts allow prison officials great deference when responding to confrontations such as the inmate riot at issue in this case:

>    Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. . . . That deference extends to prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive

measures intended to reduce the incidence of these or any other breaches of prison discipline.

Whitley, 475 U.S. at 321-322.  See also Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991) ("[T]he courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline.").  As the Supreme Court has stated in Whitley, "When the 'ever-present potential for violent confrontation and conflagration,' . . . ripens into **actual** unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' . . . carries special weight."[6]  475 U.S. at 321 (emphasis in original).  There, the Supreme Court held that the "shooting [of an inmate in the leg] was part and parcel of a good-faith effort to restore prison security . . . [and] did not violate respondent's Eighth Amendment right to be free from cruel and unusual punishments." 475 U.S. at 319.

In the instant case, there was a clear need for the application of force: the Plaintiff created a disturbance by inciting and perpetuating an inmate riot, and then refused repeated orders to cease.  Furthermore, the Plaintiff posed a potential danger to Deputies Shelton and Redman by threatening the officers with obscenities and refusing to step away from his cell door, which could have been one of the cell doors not able to be locked from the control room.  The amount of force used, the deployment of a beanbag round at the Plaintiff's abdomen, was the minimum amount of force necessary to quell the Plaintiff's contribution to the disturbance and eliminate any threat to the deputies and the security of the jail.  Further, Deputy Shelton attempted to move the inmate away from the cell door with verbal commands, before he had to resort to force, but the Plaintiff rebuffed those commands and refused to step back.  Finally, there is no evidence that the Plaintiff was substantially injured by the use of this force; his only injury was a "superficial" bruise on his

---

[6] The Supreme Court of the United States has recognized that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  Saucier v. Katz, 533 U.S. 194, 209 (U.S. 2001).

abdomen.  Clearly, in the instant case, the minimal force used was in a good faith effort to restore discipline and order, not used maliciously or sadistically for the very purpose of causing harm.

Neither the United States Supreme Court, nor the Eleventh Circuit, nor the Alabama Supreme Court has addressed the constitutionality of the use of non-lethal beanbag rounds in the law-enforcement setting.  However, the Seventh Circuit has held that an officer was justified in using a beanbag round to subdue a suicidal subject within the context of a Fourth Amendment excessive force claim.

In Bell v. Irwin, the Seventh Circuit Court of Appeals held that an officer's use of a beanbag round to stun an individual threatening suicide was reasonable when "[t]he risks of intervention, unfortunately realized when one round hit Douglas in the head, still seem less than the risks of doing nothing."  321 F.3d 637, 640 (7th Cir. 2003) (citation omitted).  Unlike in Bell, where the plaintiff suffered head trauma and memory loss as a result of the use of force, the Plaintiff in this case has suffered no permanent or serious harm.  Additionally, the risk of harm created by the plaintiff in Bell was less than the risk of harm created by the Plaintiff's actions in this case.  There, the plaintiff was threatening only his own safety, but here, the Plaintiff threatened the safety of all inmates and officers in the cell block by inciting and perpetuating an inmate riot.  He also threatened Deputies Shelton and Redman when they attempted to subdue him.  The "risk of intervention" – the temporary bruising of the abdomen, clearly outweighed the risk of doing nothing – allowing the Plaintiff to continue inciting and perpetuating an inmate riot, which posed a threat to officers and other inmates and was impeding the tornado recovery efforts.  Accordingly, the Seventh Circuit's analysis in Bell supports the conclusion that Deputy Shelton's actions were constitutional given the circumstances present.[7]

---

[7]  As discussed below, the Eleventh Circuit has cited Bell's Fourth Amendment analysis regarding the use of beanbag rounds with approval in Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005), a case that did not involve the use of beanbag rounds.

In an excessive force inquiry, the Fourth Amendment only requires an officer to demonstrate that his conduct was "objectively reasonable," whereas the Fourth Amendment requires that the officer's conduct was "conscience-shocking."  Compare Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (recognizing that "claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard.") (internal citations omitted); with County of Sacramento v. Lewis, 523 U.S. 833, 834 (1998) ("Protection against governmental arbitrariness is the core of due process, e.g., Hurtado v. California, 110 U.S. 516, 527[ (1884)], including substantive due process, see, e.g., Daniels v. Williams, 474 U.S. 327, 331[ (1986)], but only the most egregious executive action can be said to be 'arbitrary' in the constitutional sense, e.g., Collins v. Harker Heights, 503 U.S. 115, 129[ (1992)]; the cognizable level of executive abuse of power is that which shocks the conscience, e.g., id., at 128[]; Rochin v. California, 342 U.S. 165[ (1952)].").  See also, e.g, Jordan v. Cobb County, Ga., 227 F. Supp. 2d 1322, 1336 (N.D. Ga. 2001) ("As a linguistic matter, the Fourth Amendment would appear to create an easier burden for the plaintiff, as the plaintiff must only show an **unreasonable** use of force by the officer to satisfy the prohibition of that provision. As noted, to prove a Due Process violation under the Fourteenth Amendment, the plaintiff must show that the conduct is **wanton, arbitrary, or intended to punish**.  Further, as discussed *supra,* a plaintiff may also have to show a sadistic or malicious intent by the officer to prove a Due Process claim.") (emphasis in original).

In light of the higher constitutional standard under a Fourth Amendment excessive force analysis, the Seventh Circuit's decision in Bell, holding that an officer's use of a beanbag round to subdue a suicidal suspect was "objectively reasonable" under the Fourth Amendment, suggests that, in this case, Deputy Shelton's use of a beanbag round to stop the Plaintiff from inciting and perpetuating an inmate riot does not amount to the "conscience-shocking" conduct necessary to establish a Fourteenth Amendment violation.

16

The constitutional parameters for the use of force are clear, and Deputy Shelton did not exceed those limitations on his use of force under the Fourteenth Amendment. Here, it was incumbent on Deputies Shelton and Redman to stop the Plaintiff from inciting and perpetuating an inmate riot. Deputy Shelton perceived a threat to himself and to Deputy Redman, as well as to other inmates and officers present, from the Plaintiff's actions. Deputy Shelton repeatedly made efforts to subdue the Plaintiff with verbal orders, all of which were refuted; and the injury that the Plaintiff suffered as a result of Deputy Shelton's deployment of the beanbag round was "superficial." Accordingly, the Plaintiff has not pled facts that would support a claim for excessive force.

### ii.    Denial of Medical Care

There are no facts to support a claim against the Defendants for their failure to provide the Plaintiff proper medical care. In order to prevail under 42 U.S.C. § 1983 on this claim, the Plaintiff must demonstrate that the Defendants were deliberately indifferent to a "serious" medical condition, such that the Defendants' conduct constituted an Eighth Amendment violation. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'") (citing Estelle v. Gamble, 429 U.S. 97, 103-104 (1976)). In Estelle, the Supreme Court stated:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

429 U.S. at 105-06 (emphasis added).  See also, Farmer v. Brennan, 511 U.S. 825, 837 (1994) ("Deliberate indifference describes a state of mind more blameworthy than negligence."). Furthermore, where a prisoner has received medical attention and the dispute concerns the adequacy of the medical treatment, deliberate indifference is not shown.  Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985).

In the instant case, the Plaintiff has not shown that his bruise is a serious medical condition. Furthermore, the Plaintiff was taken to see Dr. Cochran, despite his refusal of medical attention, and Dr. Cochran concluded that the Plaintiff's bruise was "superficial, [and] not a serious medical condition."  (Cochran Decl., ¶ 8.)  Dr. Cochran prescribed the Plaintiff medical treatment, moist heat on the area to assist in resolution of the bruising.  Further, Administrator Moss checked on the Plaintiff's medical condition several times on his own initiative.  Such attention to the Plaintiff's injuries cannot be reasonably construed as indifference that offends the "evolving standards of decency" in violation of the Eighth Amendment.

An inmate does not have a right to a **specific** kind of treatment.  City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 246 (1983) (holding, "the injured detainee's constitutional right is to receive the needed medical treatment; **how [a municipality] obtains such treatment is not a federal constitutional question**.") (emphasis added).  Additionally, this Court should not substitute its medically untrained judgment for the professional judgment of the medical health professionals who treated Plaintiff.  See Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (stating that the evidence showed the plaintiff received "significant" medical care while in jail, and although plaintiff may have desired different modes of treatment, care provided by jail did not constitute deliberate indifference), cert. denied, 475 U.S. 1096 (1986); Westlake v.

Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (stating "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments").

Furthermore, these Defendants do not have any kind of medical education, training or experience. They rely upon the professional judgment of medical professionals who have been retained to provide care to the inmates. In Williams v. Limestone County, 198 Fed. App'x. 893 (11th Cir. 2006), the Eleventh Circuit had addressed in an unpublished opinion the issue of whether an inmate may maintain a medical claim under the auspices of § 1983 against prison officials with no medical background. In Williams, the Eleventh Circuit held that a Sheriff was not liable for failure to train his employees in emergency medical procedures. In so holding, the Court noted:

> [W]e cannot say, on this record, that "the need for more or different training [was] obvious," such that by failing to ensure jail personnel were trained in emergency medical procedures, Sheriff Blakely disregarded a substantial risk that the jail staff would be deliberately indifferent to inmates' medical needs ….
>
> [T]here is no indication from the record that Sheriff Blakely had notice his policies, training procedures, or supervision were "likely to result in the violation of a constitutional right." ….
>
> [S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. See, e.g., Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993); White v. Farrier, 849 F.2d 322, 327 (8th Cir.1988). In this case, Sheriff Blakely promulgated general procedures for dealing with emergency situations, which procedures relied primarily on the medical expertise Naphcare was obligated by contract to provide …. "[D]eliberate indifference is a stringent standard of fault, requiring proof that [the] actor disregarded a known or obvious consequence of his action." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391, [] (1997). See also Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995). Williams [the plaintiff], as the district court concluded, thus failed to meet his burden on summary judgment of establishing that Sheriff Blakely's failure to train jail personnel amounted to deliberate indifference to Williams' serious medical condition.

198 Fed. App'x. at 897-898.

The Eighth Circuit has also addressed whether a sheriff's staff may be held liable for claims of deliberate indifference to a medical condition when medical treatment is provided. In Meloy v. Bachmeier, 302 F.3d 845 (8th Cir. 2002), a former inmate sued several prison doctors, a nurse, and the prison's medical director[8] for failing to provide him with a positive air pressure machine needed to treat his sleep apnea. 302 F.3d at 847. Reversing the district court's denial of summary judgment for the director, the Eighth Circuit began by making some common sense observations. "A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions." Id. citing, Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Further, the Meloy court stated "[p]rison officials cannot substitute their judgment for a medical professional's prescription." Id. citing, Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000). Finally, the court held:

> The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision. Because the law was not clearly established that [the director] was deliberately indifferent to [the plaintiff's] serious medical needs, [the director] is entitled to qualified immunity.

302 F.3d at 849.

In the instant case, the evidence shows that the Plaintiff was treated by Dr. Cochran for Plaintiff's medical concerns regarding his "superficial" bruising. The Defendants, who are not trained and licensed medical providers, are in no way responsible for second-guessing the judgments of Dr. Cochran, a licensed and practicing medical physician.

> **b.    Neither the caselaw of the United States Supreme Court, nor the Eleventh Circuit, nor that of the Alabama Supreme Court, placed these Defendants on notice that their conduct would violate the Plaintiff's "clearly established" federal rights.**

Even had the Plaintiff successfully stated a constitutional violation, he would still have to show that the state of the law provided these Defendants "fair warning" that their conduct would

---

[8] The medical director was a trained and licensed nurse. 302 F.3d at 846.

violate Plaintiff's "clearly established" federal rights. Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003). In determining whether the Defendants' conduct was clearly established as violating Plaintiff's constitutional rights, the reviewing court must examine the state of the law at the time the alleged deprivation occurred. See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994). A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); Lancaster, 116 F.3d at 1424. "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose," here, the Alabama Supreme Court. Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted) (emphasis added). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Storck v. City of Coral Springs, 354 F.3d 1307, 1318 (11th Cir. 2003), 354 F.3d at 1318 (quoting 28 F.3d at 1149).

### i.    Use of Force

As noted above, neither the United States Supreme Court, nor the Eleventh Circuit, nor the Alabama Supreme Court has addressed the constitutional implications of the use of beanbag rounds. While the Eleventh Circuit has not directly addressed the constitutional implications of beanbag rounds in circumstances similar to those present here, that Court has cited with approval the Seventh Circuit's decision in Bell. See Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005). This limited reference to beanbag rounds certainly does not provide these Defendants notice that a deputy's use of a beanbag round to curb the instigation and perpetuation of a prison riot and to protect corrections officers from potential harm is unconstitutional.

Because no clearly established law has held a Sheriff or a jail administrator is liable under 42 U.S.C. § 1983 for a deputy's use of a beanbag round to curb the instigation and perpetuation of a prison riot and to protect corrections officers from potential harm, these Defendants cannot be deemed to have violated Plaintiff's "clearly established" rights under the existing caselaw.

### ii.    Denial of Medical Care

Neither has the United States Supreme Court, nor the Eleventh Circuit, nor the Alabama Supreme Court held that a Sheriff or a jail administrator is liable under 42 U.S.C. § 1983 for deliberate indifference to an inmate's medical needs when the injuries were not serious and were treated by a doctor.  As noted above, the Eleventh Circuit has recognized a cause of action for deliberate indifference, where an inmate can establish that the "deprivation alleged must be, objectively, 'sufficiently serious' and must 'implicate[] the Eighth Amendment.'"  However, no cases in this Circuit have held a Sheriff or Jail Administrator liable for deliberate indifference where an inmate has received medical treatment for injuries that were not serious. Therefore, these Defendants cannot be deemed to have violated Plaintiff's "clearly established" rights under the existing caselaw.

### c.    The text of the constitutional provisions that Plaintiff alleges were violated do not on their face prohibit the conduct of the Defendant(s).

The Eleventh Circuit has recognized an alternate method for establishing that the Defendants had notice that their conduct was unlawful.  Accordingly, even where the Plaintiff cannot demonstrate that the caselaw provides the Defendants notice that their conduct violates his constitutional rights, as is the case here, he can establish that the Defendants still had "fair warning" of the constitutional deficiencies of their conduct from the text of the constitutional provision in question.  In such a case, the Plaintiff must either demonstrate that the pertinent federal statute or federal constitutional provision is specific enough on its face to prohibit the conduct of the

Defendants as unconstitutional, even in the total absence of caselaw. <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1317 (11th Cir. 2003). The Eleventh Circuit has identified the latter method as an "obvious clarity" case. <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted). To establish this case as an "obvious clarity" case, the Plaintiff must show that "the words of the pertinent federal statute or federal constitutional provision" establishing the federal right allegedly violated are "specific enough to establish clearly the law applicable to particular conduct" such that "case law is not needed to establish that the conduct cannot be lawful." <u>Vinyard</u>, 311 F.3d at 1350.

Neither the text of the Fourth Amendment, nor the text of the Eighth Amendment, nor the text of the Fourteenth Amendment on its face, prohibits the conduct of the Defendants in this case as unconstitutional. Even if the Plaintiff had alleged conduct that violated his constitutional rights, neither the relevant bodies of caselaw nor the text of the relevant constitutional provisions would have put Sheriff Sutton, Administrator Moss, and Deputy Shelton on notice that their conduct would have violated the Plaintiff's constitutional rights. Accordingly, these Defendants are entitled to qualified immunity because they did not have notice that their actions violated any of the Plaintiff's constitutional rights.

### D. The Plaintiff has failed to allege personal involvement as required by 42 U.S.C. § 1983.

In order to establish a constitutional violation for conduct under § 1983, the Plaintiff must allege personal involvement on behalf of the Defendants. The language of 42 U.S.C. § 1983 requires proof of an affirmative causal connection between the actions taken by the Defendants and the constitutional deprivation. <u>Swint v. City of Wadley</u>, 51 F. 3d 988 (11th Cir. 1995). The requisite causal connection may be shown by the personal participation of the Defendants, a policy established by the Defendants resulting in indifference to constitutional rights, or a breach of a duty

imposed state of local law which results in constitutional injury.  Zatler v. Wainwright, 802 F.2d 397 (11th Cir. 1986).

The Plaintiff has failed to allege that either Defendant Sheriff Sutton or Administrator Moss  were in any way personally involved in the allegations surrounding the Plaintiff's claims for excessive force and deliberate indifference.  The Plaintiff has offered no allegation demonstrating that these Defendants were in any way involved in the conduct that the Plaintiff alleges is unconstitutional.   There are absolutely no facts in the record to show that these Defendants personally participated in the circumstances surrounding the Plaintiff's claims, nor does the Plaintiff allege specifically how these Defendants violated his constitutional rights.

The Eleventh Circuit in Hartley v. Parnell, 193 F.3d 1263 (11th Cir. 1999), established exactly what is required to state a claim (or prove) supervisory liability:

> Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.  The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  The deprivations that constitute widespread abuse sufficient to notify the supervising official must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted).

193 F.3d at 1269.  The causal connection may also be established where the supervisor's improper "custom or policy . . . result[s] in deliberate indifference to constitutional rights."  Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (citing Zatler v. Wainwright, 802 F.2d 397 (11th Cir. 1986)).  In light of the applicable law, the Plaintiff's allegations are insufficient to create liability on the part of Sheriff Sutton and Administrator Moss.  The Plaintiff's Complaint contains no allegations demonstrating that the Defendants were in any way involved in the actions he claims were constitutionally infirm.  Consequently, the Plaintiff's § 1983 claim is based upon

nothing more than *respondeat superior*, and the Complaint fails to state a claim for which relief may be granted against these Defendants.

**E.      There is no *respondeat superior* liability under 42 U.S.C. § 1983.**

To the extent that Plaintiff's claims against Sheriff Sutton and Administrator Moss are an attempt to hold them liable under a *respondeat superior* theory, they must fail.   Neither the express language of § 1983 nor the holdings of the United States Supreme Court support liability on this basis.

Forty-two U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, **subjects, or causes to be subjected**, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

(Emphasis added.)   The language of the statute requires that there be a direct causal link between Plaintiff and the actions of a putative defendant.   Merely employing an individual who causes harm is insufficient to invoke the remedy of this statute.

The United States Supreme Court addressed this exact issue and adopted this holding nearly thirty years ago.   Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978).   In Monell, the Court cited § 1983 and held, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."   436 U.S. at 691.   Accordingly, as both the explicit text of § 1983 and the opinions of the United States Supreme Court forbid vicarious liability, the Plaintiff's *respondeat superior* claims fail.

**F.      The Plaintiff is not entitled to an equitable remedy.**

The Plaintiff has been sentenced to ten years confinement and is in the custody of the Alabama Department of Corrections in Mt. Meigs, Alabama.   The Plaintiff is therefore no longer under these Defendants' custody or control.   Consequently, his equitable claims are moot.   See, e.g.,

Cotterall v. Paul, 755 F.2d 777, 780 (11th Cir. 1985) (prisoner's claim for injunctive relief was moot and properly dismissed, where prisoner had been transferred from county jail in which unconstitutional conditions allegedly existed); McKinnon v. Talladega County, 745 F.2d 1360, 1363 (11th Cir. 1984) ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief." (citation omitted)).  Furthermore, even if the Court were to interpret the Plaintiff's Complaint as attempting to assert a class, his claims must be dismissed because the class was not certified before his transfer.  See McKinnon, 745 F.2d at 1363 (citing Board of School Comm'rs v. Jacobs, 420 U.S. 128, 130 (1975); Dudley v. Stewart, 724 F.2d 1493, 1494 (11th Cir. 1984)).

In addition to being moot, the Plaintiff's request for equitable relief is barred for two other reasons.  First, the Plaintiff lacks standing.  Second, as a practical matter, no order of this Court to these Defendants would be able to obtain the relief the Plaintiff seeks.

### 1.    The Plaintiff Lacks Standing to Obtain an Equitable Remedy.

The Plaintiff lacks standing to pursue his equitable claims.  A plaintiff seeking the jurisdiction of the federal courts must show a personal stake in the outcome.  Baker v. Carr, 369 U.S. 186, 204 (1962).  The plaintiff must have sustained, or is about to sustain, some direct injury.  Golden v. Zwickler, 394 U.S. 103, 109-110 (1969).  Of direct relevance to the present case, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).

In City of Los Angeles v. Lyons, the plaintiff alleged that he had been subjected to a chokehold by arresting officers in violation of his federally protected rights.  461 U.S. 95, 97 (1983).  The plaintiff sought an injunction barring the future use of police chokeholds.  Id. at 98. After the Ninth Circuit affirmed the district court's grant of a preliminary injunction, the United

States Supreme Court reversed, holding that the plaintiff lacked standing.  Id. at 99-100.  The Court stated that the plaintiff's standing rested solely on pure speculation that he **might** be stopped by the police, **might** be arrested, and **might** be subjected to another chokehold.  Id. at 108.  The court noted that five months elapsed between the choking incident and the filing of the complaint and the plaintiff was not subjected to another chokehold.  Id.

The Plaintiff's claims for injunctive relief, here, are even more speculative than those in Lyons.  Because the Plaintiff is no longer an inmate in the Coffee County Jail and is, instead, serving a ten-year sentence in the custody of the Alabama Department of Corrections in Mt. Meigs, Alabama, his claim is premised on the following hypothetical scenario: the Plaintiff **might** escape or be released, **might** go to Coffee County, **might** be stopped by police, **might** be arrested by an officer with authority to incarcerate someone in the Coffee County Jail, **might** be incarcerated in the Coffee County Jail, **might** again need treatment from these Defendants for his medical and mental health conditions.  Such speculation into future conduct – even if it did violate the Plaintiff's rights – does not afford the Plaintiff standing to bring this action.  Lyons, 461 U.S. at 108.

### 2.    No Order Issued by This Court Would Effectuate the Relief Sought by the Plaintiff.

The Plaintiff is no longer under the control of these Defendants.  The Plaintiff is being held by the Alabama Department of Corrections in Mt. Meigs, Alabama, pursuant to a ten-year sentence imposed upon him.  Consequently, even if the Plaintiff were otherwise able to prove his allegations, no Order of this Court against these Defendants would be effective in providing medical attention to the Plaintiff.  These Defendants do not have the power to force the Department of Corrections to do anything with or for the Plaintiff.

27

### G.    The Plaintiff is not entitled to punitive damages

"[P]unitive damages in an action under § 1983 [are only available] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. 30, 56 (U.S. 1983).  see also Ferrill v. Parker Group, Inc., 168 F.3d 468 (11th Cir. 1999):

> 'Punitive damages are disfavored by the law and are awarded solely to punish defendants and deter future wrongdoing.'  To support a punitive damages award, a plaintiff must show that the defendant acted with malice or reckless indifference to the plaintiff's federally protected rights.  Malice means 'an intent to harm' and recklessness means 'serious disregard for the consequences of [one's] actions.'

Ferrill, 168 F.3d at 468 (internal citations omitted).

The Plaintiff has not sufficiently alleged facts showing "evil motive or intent" or "reckless or callous indifference to the federally protected rights of others" on the part of Defendants.  Therefore, punitive damages are not proper against these Defendants, and all claims for punitive damages are due to be dismissed.

### H.    Summary Judgment Standard

On a motion for summary judgment, the court should view the evidence in the light most favorable to the nonmovant.  Greason v. Kemp, 891 F.2d 829, 831 (11th Cir. 1990).  However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only reasonable inferences with a foundation in the record inure to the nonmovant's benefit.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  Reeves, 530 U.S. at 151, quoting 9A C. Wright & A.

Miller, Federal Practice and Procedure § 2529, p. 299.[9] "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'" Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) quoting Massachusetts School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998).

## CONCLUSION

These Defendants deny each and every allegation made by Plaintiff Shawn Burks in his Complaint. Sheriff Sutton, Administrator Moss, and Deputy Shelton have not acted in a manner so as to deprive Plaintiff of any right to which he is entitled.

## MOTION FOR SUMMARY JUDGMENT

These Defendants respectfully request that this Honorable Court treat their Special Report as a Motion for Summary Judgment, and grant unto them the same.

Respectfully submitted this 13th day of July, 2007.

**s/Joseph L. Hubbard, Jr.**
GARY L. WILLFORD, JR., Bar No. WIL198
JOSEPH L. HUBBARD, JR., Bar No. HUB015
Attorneys for Defendants
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  jhubbard@webbeley.com

---

[9] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this the 13th day of July, 2007, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that I have mailed a true and correct copy of the foregoing by United States Mail, postage prepaid, to the following non-CM/ECF participant:

        Shawn Burks
        Elmore Correctional Facility
        P. O. Box 8
        Elmore, Alabama  36025


                **s/Joseph L. Hubbard, Jr.**
                OF COUNSEL

# EXHIBIT  A

# Inmate Records of Shawn Burks
# Intake Sheet

Coffee County Jail
Ben Moates, Sheriff
Zack Ennis, Administrator

INTAKE SHEET

Date: 3-24-06

Time: 1200

Status: ST____ FED____ CITY _____ COUNTY _____ COFFEE CO: Ent Div / Elba Div

Name: Burks _____ Shawn _____ Kavon _____ SS#: 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
        Last       First       Middle

Address: 1028 Martin Luther King Elba _____ Al _____ 36523
         Street              City           State    Zip Code

DOB: 02/01/74   POB: Opp _____ Covington _____ Al _____ _____
                     City       County          State    Country

Age: 32  Race: B  Sex: M  Hair: Blk  Eyes: Bro  Weight: 170  Height: 5' 9"

License or ID #: _____

Arresting Agency: Elba P.D. _____ Arresting Officer: Hanchey _____ Location of Arrest: Jackson St.

Type of Arrest: Warrant X  Call _____  View _____

| Offense | Mis | Fel | Bond |
|---|---|---|---|
| 1- Att. Controlled Sub. | | X | $10,000 |
| 2- Att. Controlled Sub | | X | $10,000 |
| 3- FTA | | | None |
| 4- | | | |

HOLDS: _____                    INTAKE SHEET NUMBER

_____

This form completed by: Fred & Hanchey

Booked by: _____   Searched Y/N   Photo Y/N   FPs Y/N   Green Card Y/N

Comments: _____

# EXHIBIT  B

## Inmate Records of Shawn Burks
## Sentencing Order

IN THE CIRCUIT COURT OF
COFFEE COUNTY, ALABAMA
ELBA DIVISION

STATE OF ALABAMA,                        *
                                         *
        PLAINTIFF,                       *
                                         *
VS.                                      *    CASE NO: DC-06-202 & 203
                                         *
SHAWN LAVON BURKES,                      *
                                         *
        DEFENDANT.                       *

## SENTENCING ORDER

This matter comes before the court on the **24th** day of **August, 2006** with the Defendant, **SHAWN LAVON BURKES**, present and represented by **John McClung**, Attorney at law. The State was present and represented by the **Tom Anderson**, Assistant District Attorney, Twelfth Judicial Circuit, State of Alabama.

The Defendant entered a plea of <u>GUILTY</u> to the charge of **TWO COUNTS OF ATTEMPTING TO COMMIT A CONTROLLED SUBSTANCE CRIME, to wit: COCAINE** in violation of **Section 13A-12-203**, <u>Code of Alabama</u>, 1975 against the peace and dignity of the State of Alabama. The Defendant filed an Explanation of Rights and Plea of Guilty.

The court conducted a colloquy with the Defendant and did ascertain that the Defendant made a knowledgeable, intelligent and voluntary plea and that a factual basis exists sufficient to substantiate the Defendant's guilty plea. The Defendant acknowledged that his signature appeared on the Explanation of Rights and Plea of Guilty.

*IT IS THEREFORE ORDERED, ADJUDGED and DECREED* that the Defendant, is pronounced and declared "*GUILTY*" of the charge of **Attempting to Commit A Controlled Substance Crime: to wit: Cocaine** in violation of **Section 13A-12-203**, <u>Code of Alabama</u>, 1975.

The Defendant was then:

1.  Afforded an opportunity to make a statement in Defendant's own behalf before sentencing and was further asked if the Defendant had anything to say as to why the sentence of the law should not be imposed; and

2. Afforded an opportunity to present evidence as to any matter probative in the issue of sentence and/or facts in mitigation of any penalty that is to be imposed.

3. Afforded an opportunity to state any objection Defendant may have about Defense counsel or the manner in which Defense counsel has conducted the defense.

The State stipulated the Defendant has One (1) proper prior felony conviction which is to be used for enhancement of sentence. The State and Defendant presented a written Settlement Agreement which is incorporated into this Sentencing Order. After considering the settlement agreement, recommendations of District Attorney, arguments of parties, and any evidence presented:

*IT IS ORDERED, ADJUDGED AND DECREED* that the Defendant is hereby sentenced to serve ***Ten (10) years in the State Penitentiary in each case. These sentences are to run concurrent with each other. The Defendant is given credit toward Defendant's sentence for the time the Defendant has already served while awaiting trial and/or disposition of this case.***

It Defendant is further *ORDERED*:

1. That the Defendant is to pay the cost of court and is to pay all mandatory fees, cost, fines and assessments as required by law due to conviction for said charge.

2. That the Defendant shall pay *$1,000.00* in each case Demand Reduction Assessment Fee.

3. That the Defendant shall pay *$100.00* in each case to the Clerk of the Court to be disbursed to the Alabama Department of Forensic Sciences Trust Fund.

4. That the Defendant shall pay *$50.00* in each case to the Clerk of the court to be disbursed to the Alabama Crime Victims Compensation Commission.

5. That the Defendant shall reimburse the State of Alabama for indigent attorney fees.

6. That the Defendant's driving privileges shall be suspended as provided by

law.

7.  The Defendant shall enroll and complete a substance abuse program recommended by the Court Referral Officer.

8.  The Defendant is *ORDERED* to report *IMMEDIATELY* to the State Probation/Parole Officer and to carry out any and all conditions of probation set forth by the State Probation Officer and by this court.

As conditions of sentence and probation, Defendant is *ORDERED*:

A.  To pay all court ordered monies.   Unless otherwise specified, the State Probation and Parole Office shall determine a schedule for payment of all monies the Defendant is

    ordered to pay.  The Clerk of Court shall accept partial payments.

B.  Not to violate any Federal, State or local law.

C.  Not to possess or consume any illegal controlled substance or to frequent or reside in any place known by the Defendant to house or contain illegal controlled substance.

D.  Not to gather or remain with any person or persons known to be in possession of any illegally possessed controlled substance.

E.  Not possess or consume any alcoholic beverages while on probation.

F.  Shall avoid injurious or vicious habits.

G.  Shall avoid persons or places of disrespectable or harmful conduct or character.

H.  Shall permit the Probation Officer to visit at home or elsewhere.

I.  Shall work faithfully at suitable employment as much as possible.

J.  Shall remain within the State of Alabama.

K.  Shall support dependants to the best of his ability.

L.  Shall not change residence or employment without consent of his Probation Officer.

M.  Shall submit to substance abuse test when ordered to do so by the Probation Officer. These test include urinalysis, Breathalyzer and blood samples, but are not limited

thereto.  Defendant/Probationer shall pay cost of test.

N.    Shall submit to searches by the Probation Officer of his person, residence, vehicle or any property under control of Defendant/Probationer.

O.    Shall not possess, receive or transport firearms.

P.    Shall submit to DNA testing as allowed or required by law.

Q.    Shall notify the Clerk of the Court of any change of mailing address and appear in court whenever ordered.

R.    To pay all required supervision fees accessed by the State Probation/Parole Officer.

Should the Defendant be incarcerated in any Alabama Penitentiary or Correctional Facility, and have income while therein, the Alabama Department of Corrections is *ORDERED* to pay twenty five (25%) percent of the Defendant's said fine (which funds of the Defendant the Department may come into possession) to the Clerk of Court, *Coffee* County, *Elba, Alabama,* as is allowed by law and said Department is ordered to pay the Clerk of the Court until such time as all fines, fees, cost, assessments and restitution are paid in full.

The Defendant was advised of the rights of appeal.  The Defendant did not reserve any issue or issues for appellate review and therefore waived right to appeal.

Done this the **24**th day of **August, 2006.**



JEFF W. KELLEY
CIRCUIT JUDGE

# EXHIBIT  C

## Affidavit of David Sutton

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| SHAWN L. BURKS, #188755 | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 1:07-cv-337-MEF-TFM |
| | ) |
| DAVE SUTTON, SHERIFF, et al., | ) |
| | ) |
|     Defendants. | ) |

## AFFIDAVIT OF DAVID T. SUTTON

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF COFFEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared David T. Sutton, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.    My name is David T. Sutton. I am over the age of nineteen and competent to make this affidavit.

2.    I was certified in Jail Management by the Texas Commission on Law Enforcement in 1974.

3.    I was certified as a law enforcement officer by the Texas Commission on Law Enforcement in 1970. I was certified again by the Alabama Peace Officers Standards and Training Commission in 1996.

4.    I am the duly elected Sheriff of Coffee County, Alabama. I have served in that capacity for approximately five months. I have been a law enforcement officer in Texas and Alabama for ten years. I also served for one year as the Taylor County, Texas Jail

1

Administrator. I have a total of 11 years actively working in law enforcement since my original certification.

5.    I also retired after 24 years from the United States Army as a medical service aviator with the rank of lieutenant colonel.

6.    I read the Plaintiff's complaints in this matter and have personal knowledge of the facts underlying the Plaintiff's claims.

7.    On March 1, 2007, the City of Enterprise in Coffee County was struck by a devastating tornado. From March 1, 2007 to March 19, 2007, my department was actively involved in search and recovery operations.

8.    On Saturday, March 3, 2007, a riot occurred in the Coffee County Jail. It is my understanding that the riot occurred because the inmates in Cell Block 2 were angry that they did not get a second smoke break prior to lock down.

9.    I first became aware of a problem at the jail when I heard a call for assistance over a scanner that I keep in my home. I immediately went to the jail.

10.    When I arrived at the jail, there was an obvious disturbance in Cell Block 2 and I went straight to the Cell Block.

11.    Several of my deputies were in the process of removing prisoners from Cell Block 2 to intake.

12.    The inmates were yelling obscenities and there was a general feeling of disorder in the cell block.

13.    I went back to Intake to see what was occurring with the inmates who had been removed from the cell block.

14.    In Intake, I spoke with Deputy Stokes who informed me that one of the inmates had thrown urine on her.

2

15.    I walked up to three inmates who were being held in intake.

16.    I asked one of the inmates, whom I later learned was Timothy Council, if he threw urine on the deputy. He cursed at me. I identified myself and told him not to use profanity in my presence.

17.    At this time, Deputy Neal Bradley walked up to Mr. Council and informed him as to how he was going to remove the TASER probe from him. I observed Deputy Bradley remove the probe.

18.    When the probe was removed, Mr. Council simply said "ouch". There was no blood from the wound.

19.    I then informed the three inmates that whatever they were attempting to do would cease. I informed them that we were out trying to help their families and the community recover from the tornado, and the timing could not have been worse for them to do what they were doing.

20.    I left intake and went back to Cell Block 2.

21.    When I entered the cell block, the inmates were still boisterous, but they had been locked down.

22.    Prior to this incident, there were three to five cell doors that could not be electronically locked from the control room. By the time I arrived in Cell Block 2 for the second time, deputies and jailers had manually locked each cell. Since that time, we have completed repairs to the cell doors and all doors can now be electronically locked from the control room.

23.    When I returned for the second time, I addressed all of the inmates in the Cell Block. I demanded their attention and required all inmates to step to the bars. I informed them that this was not a good night for them to be acting up because we were trying to help their families recover from the tornado.

3

24.    After I finished speaking, one of the inmates began heckling us again. Several inmates told the heckler to shut up and let the Sheriff and his deputies do their job.

25.    I went back to my office and held a debriefing with the deputies and jailers who were involved in the incident. I was made fully aware in this meeting that TASERs and bean bag rounds had been deployed. I directed my jailers to keep an eye on the individuals who had been subjected to the TASERs and bean bag rounds in the event they needed medical attention. They were specifically directed to obtain any medical treatment the inmates needed.

26.    I also directed the involved deputies and jailers to write the statements that are included as exhibits in the Defendants' Special Report.

27.    I left the jail and resumed my part in the recovery efforts.

28.    Both Inmate Timothy Council and Shawn Burks were taken to the jail doctor as a precautionary measure on the following Monday, March 5, 2007.

29.    My policy is that excessive force is not to be used on anyone – including inmates in the jail. If excessive force is used, it is a violation of my policies.

30.    I reviewed the statements that were prepared at my direction regarding the incident. Based upon those statements, my meeting with the involved persons and senior officers, and my training and experience, I came to the conclusion that the force used by Deputies Jeffery Shelton, Neal Bradley, Candida Stokes, and Austin Redman was completely reasonable and necessary to restore order in the jail. Furthermore, I concluded that their actions enabled us to quickly regain control of the cell block, prevented the unrest from spreading to the rest of the jail, and prevented far greater injuries from being inflicted upon jail staff and inmates.

31.    I also dismissed one of the jailers involved in the incident. The evidence showed that when two other jailers were initially threatened by the inmates in Cell Block 2, the dismissed

4

jailer used profanity towards the jailers and refused to open the cell block door to allow them to get away from the inmates.

32.      The District Attorney's Office was also contacted.  Their investigator conducted an investigation of the March 3, 2007 incident.  The only charges that have been filed were against Inmate Marcus Snell for throwing urine on Deputy Stokes.

33.      Attached to the Defendants' Special Report are true and correct copies of the Plaintiff's inmate and medical records.  These records are prepared and kept in the regular course of business of the Coffee County Jail.

34.      I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the 24th day of May, 2007.

_David T. Sutton_

**SWORN TO** and **SUBSCRIBED** before me this 24th day of May, 2007.

NOTARY PUBLIC

My Commission Expires: March 4, 2008

5

# EXHIBIT  D

## Affidavit of Jeffery Shelton

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAWN L. BURKS, #188755 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-337-MEF-TFM |
| | ) | |
| DAVE SUTTON, SHERIFF, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JEFFERY W. SHELTON

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF COFFEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Jeffery W. Shelton, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.    My name is Jeffery W. Shelton.  I am over the age of nineteen and competent to make this affidavit.

2.    I am a deputy with the rank of sergeant in the Coffee County Sheriff's Department.  I have served in that capacity for six months.  Prior to that I served with the Elba, Alabama Police Department as an officer for over four years.  Prior to that I was with the New Brockton, Alabama Police Department for approximately two years.  I also served in the Birmingham, Alabama Police Department for approximately eight years.  Prior to that I was with the Decatur, Alabama Police Department for approximately three years.  I have nearly 18 years in law enforcement.

1

3.      I read the Plaintiff's complaints in this matter and have personal knowledge of the facts underlying Inmate Council's claims.

4.      On March 3, 2007, just two days after a tornado struck Enterprise, Alabama in Coffee County, I was on duty and performing perimeter patrol around the area affected by the tornado.

5.      While I was on my supper break I heard several radio calls from jailers at the Coffee County Jail. Shortly thereafter, a call for assistance at the jail came over the radio and I responded to the jail.

6.      I arrived at the jail at the same time as Deputies Neal Bradley, Austin Redman and Michael Hines. We were told that the inmates in Cell Block 2 were refusing to lock down and were fighting.

7.      Within a week prior to March 3, 2007, I personally participated in a search of the jail that resulted in at least one shank being discovered and removed from Cell Block 2.

8.      I obtained my 12 gauge shotgun that I only used for bean bag rounds and loaded it with the four bean bag rounds that I had in preparation to go into Cell Block 2.

9.      In approximately 2004 I attended a Tactical Shotgun Instructor Development Course. One day of the instruction was dedicated to non-lethal rounds such as bean bags. This training certified me as a user and instructor for tactical shotgun – including less-than-lethal rounds.

10.      I, along with Deputies Bradley, Redman and Hines went to Cell Block 2 and met Deputy Candida Stokes as she was escorting an inmate I later learned was Marcus Snell to Intake from Cell Block 2. Deputy Stokes stated that she had to use her TASER on the inmate and that another inmate had thrown a cup of urine on her from Cell 17. One of the jailers standing nearby said the inmate who threw the urine was Alex Pyatt and he was in Cell 17.

2

11.    When we entered the cell block, we began yelling at the inmates to lock down and return to their cells. Several inmates complied and ran to their cells and slammed the doors.

12.    The four of us then went to Cell 17 on the second floor. By this time, the inmates in Cell 17 had closed the door. Our intent was to take Inmate Pyatt into custody for his assault on Deputy Stokes.

13.    There were only two inmates in Cell 17. I later learned that they were Alex Pyatt and Timothy Council.

14.    When we got to the door of Cell 17, we called out to "Central", the control room that runs the entire jail, to unlock Cell 17.

15.    Simultaneously, we instructed Inmates Pyatt and Council to get down on the ground. Inmate Pyatt complied with our instructions. Council did not comply.

16.    The four of us entered the cell. Deputy Bradley continued to command Inmate Council to get down on the floor. Inmate Council did not comply and cursed Deputy Bradley.

17.    Deputy Bradley deployed his TASER on Inmate Council.

18.    The TASER appeared to initially have an effect on Inmate Council, but after he slid to the floor, did not seem to affect him again.

19.    Inmate Council was able to crawl under a bunk in the cell.

20.    During this time, Deputy Bradley continued giving Inmate Council commands to come out from under the bunk. Inmate Council did not comply.

21.    I also instructed Inmate Council to come out from under the bunk and he still refused to comply. To the contrary, Inmate Council went as far under the bunk as he could and began moving various items that were under the bunk.

22.    In light of this, as well as the earlier discovery of a shank in the same cell block, I became concerned that Inmate Council might be attempting to obtain a weapon.

3

23.    I decided at that time to fire a bean bag round in an attempt to obtain compliance from Inmate Council and prevent him from becoming a greater threat.

24.    I deliberately fired the round so that it would ricochet off the ground and strike Inmate Council in the hip area.  This point of aim was in accordance with the training I had received on how to deploy bean bag rounds.

25.    When I fired, the bean bag hit the ground approximately 6 to 12 inches away from Inmate Council and struck him in the hip area.

26.    Inmate Council did not make any sound when the bean bag struck him, but he immediately came out from under the bunk.

27.    Inmate Council was handcuffed and removed from the cell.  Inmate Pyatt had already been taken from the cell by the other deputies.

28.    Deputy Bradley took Inmate Council straight to Intake without further incident.  I had no further interaction with Inmate Council that night.

29.    No further force was used on Inmate Council at any time after the bean bag round struck him.

30.    After Inmates Pyatt and Council were removed from Cell Block 2, I remained to deal with other inmates who were still refusing orders to lock down.

31.    During the course of dealing with Inmates Pyatt and Council, I noticed the Plaintiff screaming at the other inmates in what appeared to be an attempt to incite them to continue to riot.

32.    I knew at the time that there were three to four cells that would not lock.  It also appeared that other inmates were in cells that would lock, but they might not have actually been locked.

33.    Although the Plaintiff's door was closed I could not tell if his door was locked.

4

34.    I wanted to approach the cell in order to ensure his cell door was locked and to get him to stop inciting others to riot.

35.    I ordered the Plaintiff to step back from the door. The Plaintiff refused to comply and asked me "Whatcha gonna do, motherfucker?" I ordered him at least two to three times to step back and he refused each time.

36.    The next to the last time I ordered him to stand back, I aimed my shotgun at his belly button as I was giving the order.

37.    The Plaintiff stated, "You can't shoot me, motherfucker."

38.    I ordered him again to step back again, and the Plaintiff said, "Fuck you, motherfucker!"

39.    In order to gain his compliance and accomplish my objectives, I then fired a bean bag round.

40.    At the time I fired, I was 20 to 30 feet from the Plaintiff. My point of aim was the Plaintiff's belly button.

41.    The bean bag round struck the Plaintiff immediately above the belly button, and I watched it bounce off of him.

42.    The manner in which I fired the weapon was in accordance with the training I had received in less-than-lethal shotgun rounds.

43.    After he was hit, the Plaintiff stepped back three to four steps. He stood there for a moment and then went over and sat on his bunk.

44.    He did not say another word.

45.    The Plaintiff did not request medical treatment either that night or the next day. However, I understand that he was eventually seen by a doctor regarding bruising from the bean bag round.

5

46.    I walked to the cell door and made sure it was secured.

47.    After the Plaintiff was subdued, the cell block quieted down and there were no further problems.

48.    It took, all told, approximately 20-25 minutes for us to regain control of the cell block.

49.    After Cell Block 2 was secured, I went back in with Sheriff Sutton.  Sheriff Sutton told the inmates that they ought to be ashamed of themselves because they had forced us to abandon our efforts to help their families in order to deal with them.

50.    There were no more problems in the jail that night or since that night.

51.    The only contact I had with Inmate Burks after that was when Deputy Bradley, at my request, took pictures of him and Timothy Council the next day to document their injuries. True and correct copies of these pictures are attached to the Defendants' Special Report.

52.    I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the 23rd day of May, 2007.

Jeffery W. Shelton

**SWORN TO** and **SUBSCRIBED** before me this 23rd day of May, 2007.

NOTARY PUBLIC

My Commission Expires: March 4, 2008

# EXHIBIT  E

# Affidavit of Neal Bradley

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHAWN L. BURKS, #188755            )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        Civil Action No. 1:07-cv-337-MEF-TFM
                                   )
DAVE SUTTON, SHERIFF, et al.,      )
                                   )
        Defendants.                )

## AFFIDAVIT OF NEAL BRADLEY

STATE OF ALABAMA          )
                          )
COUNTY OF COFFEE          )

BEFORE ME, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Neal Bradley, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.      My name is Neal Bradley.  I am over the age of nineteen and competent to make this affidavit.

2.      I am a deputy with the Coffee County Sheriff's Department.  I have served in that capacity for approximately three and one-half years.  Prior to that I served with the Elba, Alabama Police Department as a police officer for eight months.  Prior to that I was a deputy with the Geneva County, Alabama Sheriff's Department for two years.  I began my law enforcement career approximately one year before that as an officer with the Samson, Alabama Police Department.  I have a total of seven years in law enforcement.

3.      I read the Plaintiff's complaints in this matter and have personal knowledge of the facts underlying the Plaintiff's claims.

1

4.     On March 3, 2007, just two days after a tornado struck Enterprise, Alabama in Coffee County, I was on duty and performing perimeter patrol around the area affected by the tornado.

5.     While I was on my supper break I heard several radio calls from jailers at the Coffee County Jail. Shortly thereafter, a call for assistance at the jail came over the radio and I responded to the jail.

6.     I arrived at the jail at the same time as Sergeant Jeffery Shelton and Deputies Austin Redman and Michael Hines. We were told that the inmates in Cell Block 2 were refusing to lock down and were fighting.

7.     Within a week prior to March 3, 2007, I personally participated in a search of the jail that resulted in at least one shank being discovered and removed from Cell Block 2.

8.     I donned my tactical vest which contained my X-26 TASER and extra cartridges along with extra handcuffs in preparation to go back into Cell Block 2.

9.     I, along with Sergeant Shelton and Deputies Redman and Hines went to Cell Block 2 and met Deputy Candida Stokes as she was escorting an inmate I later learned was Marcus Snell to Intake from Cell Block 2. Deputy Stokes stated that she had to use her TASER on the inmate and that another inmate had thrown a cup of urine on her from Cell 17. One of the jailers standing nearby said the inmate who threw the urine was Alex Pyatt and he was in Cell 17.

10.     When we entered the cell block, we began yelling at the inmates to lock down and return to their cells. Several inmates complied and ran to their cells and slammed the doors.

11.     The four of us then went to Cell 17 on the second floor. By this time, the inmates in Cell 17 had closed the door. Our intent was to take Inmate Pyatt into custody for his assault on Deputy Stokes.

2

12.     There were only two inmates in Cell 17. I later learned that they were Alex Pyatt and Timothy Council.

13.     When we got to the door of Cell 17, we called out to "Central", the control room that runs the entire jail, to unlock Cell 17.

14.     Simultaneously, we instructed Inmates Pyatt and Council to get down on the ground. Inmate Pyatt complied with our instructions. The Council did not.

15.     Once the door opened, we entered the cell. I had my X-26 TASER turned on and in my hand as we entered. I had the laser dot of the TASER on Council as we made entry because he continued refusing orders to get on the ground. Council backed up and went behind a sheet the inmates had strung up between a bunk and the toilet.

16.     I ordered Council to the ground. Instead of complying, Council raised his hands in an aggressive manner and shouted, "Whatcha gonna do, motherfucker?"

17.     At that time I pulled the sheet down because I was concerned that it would interfere with the TASER in the event I had to deploy it.

18.     I am certified in the use of the TASER device. The X-26 is an Electronic Control Device (ECD) that can be used in two modes. In the "drive stun" mode, the device must be placed against the subject in order to deliver an electrical charge. The electrical charge disrupts both the sensory and motor nervous systems. In the drive stun mode the effect of the TASER is more localized to the area in which the TASER comes into contact. In the cartridge mode, the TASER fires two barbed probes from a cartridge attached to the front of the TASER. The probes remain attached to the front of the device by filament wires that conduct an electrical charge from the TASER through the barbs and into the subject's body. When used in the cartridge mode, the TASER effects a larger person of the subject's body and, depending upon where the probes strike, can effect the entire body.

19.    In either the drive stun or the cartridge mode, the TASER is deployed by pulling the trigger.    When the trigger is pulled, the TASER will deliver a five-second charge of electricity that cannot be interrupted unless the device is turned off.

20.    When Council continued to refuse our commands and the sheet was removed, I deployed my TASER in the cartridge mode.    One probe hit Council in the abdomen, the second apparently scratched the inmate's hand, but did not stick.    However, the line from the probe that missed apparently was in contact with Council and delivered electricity to him.    Council went back against the far wall of the cell and slid down to the floor.

21.    Once the Council hit the floor, he began moving towards one of the bunks.    I attempted to deploy the TASER a second time by pulling the trigger.    However, the TASER began to pop loudly and Council was able to continue moving towards the bed.    Based upon my understanding of how the TASER operates, the loud popping sound combined with the apparent lack of effect on the inmate, indicated that one or more of the probes had broken contact with Council and the TASER most likely would not work unless I fired a second cartridge into the inmate.

22.    Inmate Council was able during this time to crawl under the bunk.    He moved his body to the far wall and began positing items that were under the bunk so that they would be between us.    I pulled the trigger on my TASER again in the hopes that it might work, but it still had no effect.

23.    During this entire time, I continued giving Inmate Council voice commands.    I told him repeatedly to come out from under the bunk, but he refused.

24.    I got down so that I could make visual contact with him.

25.    At that time, after repeated commands from us and refusals to comply by the inmate, Sergeant Shelton came up beside me and fired a bean bag round from his shotgun.    I saw

4

the bean bag strike the floor approximately six to twelve inches from Inmate Council and struck him in the hip.

26.    Inmate Council did not make any sound when the bean bag struck him, but he immediately came out from under the bunk.

27.    Council was handcuffed and removed from the cell.  Inmate Pyatt had already been taken from the cell by the other deputies.

28.    I took Inmate Council straight to Intake without further incident.

29.    Council was compliant until he was seated in a chair at Intake.  At that time, the he began to get mouthy again.

30.    However, at no time after the bean bag round struck Inmate Council was any further force used against him.

31.    I personally removed the one probe from Inmate Council in the manner in which I had been taught.

32.    Council did not appear to need medical attention and he did not request any.

33.    I did not go back into Cell Block 2 until the cell block was secure.  I went in with Sheriff Sutton.  Sheriff Sutton told the inmates that they ought to be ashamed of themselves because they had forced us to abandon our efforts to help their families in order to deal with them.

34.    There were no more problems in the jail that night or since that night.

35.    The only contact I had with the Plaintiff was when I took pictures of the Plaintiff and Inmate Council the next day to document their injuries.  True and correct copies of these pictures are attached to the Defendants' Special Report.

36.   I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the 23rd day of May, 2007.

Neal Bradley

**SWORN TO** and **SUBSCRIBED** before me this 23rd day of May, 2007.

NOTARY PUBLIC

My Commission Expires: March 4, 2008

# EXHIBIT  F

# Affidavit of Richard Moss

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAWN L. BURKS, #188755 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-337-MEF-TFM |
| | ) | |
| DAVE SUTTON, SHERIFF, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF RICHARD B. MOSS

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF COFFEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Richard B. Moss, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.     My name is Richard B. Moss.  I am over the age of nineteen and competent to make this affidavit.

2.     I the Jail Administrator of the Coffee County Jail.  I have served in this position for over five months.  Prior to becoming the Jail Administrator, I was a police officer with the Elba, Alabama Police Department for two years.  Prior to that I served as a police officer with the Town of River Falls, Alabama Police Department for approximately five years.  I have a total of seven and one-half years of law enforcement experience.

3.     I read the Plaintiff's complaints in this matter and have personal knowledge of the facts underlying the Plaintiff's claims.

1

4.      On March 1, 2007, the City of Enterprise in Coffee County was struck by a devastating tornado. From March 1, 2007 to March 19, 2007, my department was actively involved in search and recovery operations.

5.      On Saturday, March 3, 2007, a riot occurred in the Coffee County Jail. It is my understanding that the riot occurred because the inmates in Cell Block 2 were angry that they did not get a second smoke break prior to lock down.

6.      I first became aware of a problem at the jail when Jack Caradine, an off duty corrections officer, called me on my line while I was on my way home. As I had my children with me, I dropped them off at home, and then went immediately thereafter to the jail.

7.      By the time I arrived at the jail, the disturbance was over.

8.      I went to Cell Block 2 where the riot had occurred. I stood in the middle of the day room area of the cell block and informed the cell block that their actions would not be tolerated. I informed them that no one would be mistreated.

9.      I then went to each cell and spoke to any inmate who would speak to me. I asked them individually about what had happened and asked them what they thought could have been done to prevent the situation.

10.     I spoke with Inmate Shawn Burks. Mr. Burks related that he had been given an order to go to his cell. Mr. Burks said that the inmates going to lock down would have prevented the situation.

11.     Mr. Burks also stated that he saw four deputies go upstairs to Cell 17 and later heard a shotgun blast. He stated that he thought the deputies had killed one of the inmates in Cell 17, and that was why he had acted in the manner he did when the deputies left the cell.

2

12.     I knew prior to going in to speak with Mr. Burks that he had been hit with a bean bag round. I asked Mr. Burks to show me his abdomen. I saw an abrasion with discoloration approximately three inches above his navel. The area also appeared to have hardened.

13.     I asked Mr. Burks if he needed immediate medical assistance and he said "no".

14.     I then told the entire cell block that if they wanted to file a grievance, they should request a form and send it to me.

15.     I received approximately six such grievances and placed each one in the file of the inmate making the grievance. Inmate Burks was not one of those making a grievance.

16.     It is the policy of the Coffee County Jail that an inmate with a grievance may request a grievance form from any corrections officer at any time. The grievance form can then be returned completed to any corrections officer. The corrections officers are tasked with the job of attempting to respond to the grievance if possible. If they cannot, the grievance is passed on to me.

17.     If I am unable to handle the grievance, we conduct a grievance hearing. The grievance/disciplinary committee consists of myself, Chief Deputy Ronnie Whitworth, and Deputy Neal Bradley.

18.     I went back to Intake after speaking with the inmates in Cell Block 2.

19.     In Intake, I saw Inmate Council and asked him if he was OK. He said no and pointed to his wrist and elbow. He did not indicate that he had any problems with his legs.

20.     I told him that we would get him to a doctor. I asked if he needed medical attention immediately and he said "no".

21.     When I arrived at work on Monday, March 5, 2007, I asked for Inmate Burks to be brought to my office. I asked him how he was feeling and he said he was sore. He also said he had blood in his urine.

3

22.    I asked him to raise his shirt and observed the same abrasion I saw previously and a purplish bruise radiating out approximately three to four inches around the abrasion.

23.    I informed Mr. Burks that he would be going to the doctor as a precaution.

24.    I next spoke with Timothy Council.  Mr. Council did not have any wounds that I observed.  Nevertheless, I informed Inmate Council that he would be taken to the doctor as well.

25.    I personally took both inmates to see the jail doctor, Dr. Henry Cochran.

26.    While enroute to the doctor's office, I spoke with Inmates Burks and Council.  I asked them if they thought the riot could have been avoided.  Both said "yes".  I asked them if there was anything I could have done different to prevent the incident, and both responded "no sir."

27.    At the doctor's office, Inmate Burks stated, "Captain Moss, if I would have just got on my bunk and stayed there, none of this would have happened to me."  He also apologized to me for "letting things get out of hand."

28.    Inmate Council also apologized, but stated that he felt he should not have been shot with the bean bag round from the shotgun.

29.    I was in the exam room while the doctor examined both inmates.  I allowed them to tell the doctor what happened, and then I explained to the doctor what had happened at the jail. I told the doctor what force had been used against the two inmates.

30.    Dr. Cochran later remarked that neither inmate was seriously injured.  In fact, he had very little to say about Inmate Council.

31.    The doctor prescribed treatment for both inmates that was given as prescribed.

32.    The policy of the Coffee County Jail is that excessive force is not to be used on anyone – including inmates in the jail.  If excessive force is used, it is a violation of the jail's policies.

4

33.    I reviewed the statements that were prepared by my corrections officers at Sheriff Sutton's direction regarding the incident. As a result of reviewing those statements, I came to the conclusion that the shift supervisor on duty at the time needed to be dismissed. The evidence showed that when two other jailers were initially threatened by the inmates in Cell Block 2, the dismissed jailer used profanity towards the jailers and refused to open the cell block door to allow them to get away from the inmates. Sheriff Sutton later fired the shift supervisor.

34.    Attached to the Defendants' Special Report are true and correct copies of the Plaintiff's inmate and medical records. These records are prepared and kept in the regular course of business of the Coffee County Jail.

35.    I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the 25th day of May, 2007.

_____
Richard B. Moss

**SWORN TO** and **SUBSCRIBED** before me this 25th day of May, 2007.

_____
NOTARY PUBLIC
My Commission Expires: March 4, 2008

5

# EXHIBIT  G

## Affidavit of Austin Redman

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAWN L. BURKS, #188755 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-337-MEF-TFM |
| | ) | |
| DAVE SUTTON, SHERIFF, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF AUSTIN REDMAN

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF COFFEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Austin Redman, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.      My name is Austin Redman. I am over the age of nineteen and competent to make this affidavit.

2.      I am a deputy with the Coffee County Sheriff's Department. I have served in that capacity for three and one-half years. Prior to that I served with the Elba Police Department as an officer for two years. Prior to that I served as an officer with the New Brockton, Alabama Police Department for one year. I have a total of six and one-half years in law enforcement.

3.      I read the Plaintiff's complaints in this matter and have personal knowledge of the facts underlying the Plaintiff's claims.

1

4.    On March 3, 2007, just two days after a tornado struck Enterprise, Alabama in Coffee County, I was on duty and performing perimeter patrol around the area affected by the tornado.

5.    While I was on my supper break I heard several radio calls from jailers at the Coffee County Jail. Shortly thereafter, a call for assistance at the jail came over the radio and I responded to the jail.

6.    I arrived at the jail at the same time as Sergeant Jeffery Shelton and Deputies Neal Bradley and Michael Hines. We were told that the inmates in Cell Block 2 were refusing to lock down and were fighting.

7.    Within a week prior to March 3, 2007, I personally participated in a search of the jail that resulted in at least one shank being discovered and removed from Cell Block 2.

8.    I obtained my 12 gauge shotgun that I only used for bean bag rounds and loaded it with the four bean bag rounds that I had in preparation to go into Cell Block 2.

9.    Prior to this time I had received instruction on the use of less-than-lethal shotgun rounds from the Department firearms instructor, Sergeant Shelton.

10.    I, along with Sergeant Shelton, and Deputies Bradley and Hines went to Cell Block 2 and met Deputy Candida Stokes as she was escorting an inmate I later learned was Marcus Snell to Intake from Cell Block 2. Deputy Stokes stated that she had to use her TASER on the inmate and that another inmate had thrown a cup of urine on her from Cell 17. One of the jailers standing nearby said the inmate who threw the urine was Alex Pyatt and he was in Cell 17.

11.    When we entered the cell block, we began yelling at the inmates to lock down and return to their cells. Several inmates complied and ran to their cells and slammed the doors.

2

24.    In light of this, as well as the earlier discovery of a shank in the same cell block, I became concerned that the Plaintiff might be attempting to obtain a weapon.

25.    Sergeant Shelton fired his shotgun. I observed the bean bag bounce off the floor and strike the Plaintiff in the hip.

26.    The Plaintiff did not make any sound when the bean bag struck him, but he immediately came out from under the bunk.

27.    The Plaintiff was handcuffed and removed from the cell.

28.    Deputy Bradley took the Plaintiff straight to Intake without further incident. I had no further interaction with the Plaintiff that night.

29.    No further force was used on the Plaintiff at any time after the bean bag round struck him.

30.    After Inmates Pyatt and Council were removed from Cell Block 2, I remained to deal with other inmates who were still refusing orders to lock down.

31.    During the course of dealing with Inmates Pyatt and Council, I noticed the Plaintiff screaming at the other inmates in what appeared to be an attempt to incite them to continue to riot.

32.    I knew at the time that there were three to four cells that would not lock. It also appeared that other inmates were in cells that would lock, but they might not have actually been locked.

33.    Although the Plaintiff's door was closed I could not tell if his door was locked.

34.    Sergeant Shelton and I wanted to approach the cell in order to ensure his cell door was locked and to get him to stop inciting others to riot.

4

35.     Sergeant Shelton ordered the Plaintiff to step back from the door.  The Plaintiff refused to comply and asked "Whatcha gonna do, motherfucker?"  Sergeant Shelton ordered him at least two to three times to step back and he refused each time.

36.     The next to the last time Sergeant Shelton ordered the Plaintiff to stand back, he pointed his shotgun at the Plaintiff as he was giving the order.

37.     The Plaintiff stated, "You can't shoot me, motherfucker."

38.     Sergeant Shelton ordered the Plaintiff again to step back again, and the Plaintiff said, "Fuck you, motherfucker!"

39.     Sergeant Shelton fired his shotgun at the Plaintiff from 20 to 30 feet away.

40.     The bean bag round struck the Plaintiff immediately above the belly button, and I watched it bounce off of him.

41.     After he was hit, the Plaintiff stepped back three to four steps.  He stood there for a moment and then went over and sat on his bunk.

42.     He did not say another word.

43.     The Plaintiff did not request medical treatment either that night or the next day. However, I understand that he was eventually seen by a doctor regarding bruising from the bean bag round.

44.     Sergeant Shelton walked to the cell door and checked it.

45.     After the Plaintiff was subdued, the cell block quieted down and there were no further problems.

46.     It took, all told, approximately 20-25 minutes for us to regain control of the cell block.

47. After Cell Block 2 was secured, I went back in with Sheriff Sutton. Sheriff Sutton told the inmates that they ought to be ashamed of themselves because they had forced us to abandon our efforts to help their families in order to deal with them.

48. There were no more problems in the jail that night or since that night.

49. I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

Executed on this the ___24___ day of May, 2007.

_____
Austin Redman

**SWORN TO** and **SUBSCRIBED** before me this 24th day of May, 2007.

_____
NOTARY PUBLIC

My Commission Expires: March 4, 2008

# EXHIBIT  H

# Declaration of Dr. Henry Cochran

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **SHAWN L. BURKS, #188755** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Civil Action No. 1:07-cv-337-MEF-TFM** |
| | ) |
| **DAVE SUTTON, SHERIFF, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**DECLARATION OF HENRY STEWART COCHRAN
PURSUANT TO 28 U.S.C. § 1746**

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) |
| **COUNTY OF COFFEE** | ) |

1.     My name is Henry Stewart Cochran.  I am over the age of nineteen and competent to make this declaration.

2.     I have been a medical doctor for 32 years.  I obtained my M.D. from Wake Forrest University in 1975.  I did my residency at Fitzsimmons Army Hospital.  I served 21 years as a physician in the United States Army.  I have my own family practice and also work as an emergency room physician at Elba General Hospital.

3.     I treated the Plaintiff on March 5, 2007.

4.     The Plaintiff complained that he had been hit by a bean bag round from a shotgun. He complained to the nurse that he had blood in his urine.

5.     Upon examination, I noted he had a bruise on his abdomen.  The bruise was not tender to the touch.

6.     The Plaintiff's urine did not contain blood.

1

7.    The only course of treatment I prescribed was moist heat on the area to assist in resolution of the bruising.

8.    The Plaintiff's injury was superficial, it was not a serious medical condition. The bruise was not life-threatening and would not have any permanent effect on the Plaintiff.

9.    Under normal circumstances, all of the Plaintiff's symptoms would resolve within a week.

10.    I declare under penalty of perjury that the foregoing is true and correct. I further declare that I am competent to make this declaration, and that the above statements were made by drawing from my personal knowledge and information regarding this case, as well as my professional training, education, and experience.

Executed on this the **22** day of June, 2007.

_Henry S. Cochran, MD_
Henry Stewart Cochran